May it please the Court, I represent Radio Systems Corporation, and there are two basic issues before the Court today. One is whether Accession conceded jurisdiction by entering into a confidential disclosure agreement with the Forum Selection Clause. The other issue is whether there were sufficient contacts by Accession with the Forum to support specific jurisdiction. I'd like to address the second question first, the minimum contacts question. Is our feeling that this case closely mirrors this Court's decision in Electronics for Imaging? If it hadn't been for the visit here, would you lose? I would say no, Your Honor, because there were extensive communications. There was an initial effort before the visit here to sell the subject matter of what eventually became the one-for-one patent. Then we held that licensing efforts don't give specific jurisdiction. Your Honor, the licensing efforts that you've talked about in the cases I'm aware of have been situations where there have been a cease and desist letter, and then coupled with that cease and desist letter, there have been offers of license. Those are situations where in Red Wing Shoe, you said they're equivalent to settlement officer offers. The other cases that I'm aware of, there were situations where the licensing efforts were directed at third parties and not at the declaratory judgment plaintiff. So we're looking at this as different. This is a situation where they come to radio systems unsolicited and ask for an opportunity to do business. They're not alleging infringement. They're wanting a business opportunity. They voluntarily come into the jurisdiction, first of all, with letters, and as the series of correspondence shows, the response they got was less than warm, and they continue and continue, and finally, radio systems acquiesces and gives the opportunity to come in and show the product, but before that opportunity is given, they insist upon a confidential disclosure agreement. So you've got a situation where you've got not just an offer of license. There's somebody that's coming into the jurisdiction wanting to set up a business relationship, not alleging infringement, wanting a business deal. Was there any discussion at the meeting held in Tennessee about either the enforcement of the patent or the validity thereof? There's nothing in the record to show what was discussed. Now, my understanding of what was discussed was it was simply a demonstration of the product, and if you look at the correspondence, it looks like the infringement allegations actually come up after the meeting. He sees the product in a store someplace. Actually, the product had been out for a year or more, but he sees the product in a store, and then the infringement allegations start. The offers of licenses continue as a settlement negotiation tool, but you have all this other activity prior to the infringement allegations where they're trying to set up a business relationship. It's the standard. I'm going to submit my invention to the manufacturer and see if I can strike a deal. In what respect, though, does the declaratory judgment action arise out of or relate to that meeting if the meeting didn't deal with either enforcement or validity? The subject of the meeting was a deal over the subject matter of the 141 patent, and when radio systems refused to make a deal... Let's be precise. The discussion was with respect to either a license under that patent or the purchase of products made by Ascension, correct? That's not correct, Your Honor. I think that what, if you look at the early correspondence, I think what he was wanting, it's kind of vague, but he says assistance in commercializing the product. I don't think he ever intended for radio systems to sell his products. What he was looking for is either radio systems to assist him in some way or to license the patent. And when radio systems refused to license the patent, then the allegations of infringement come, which directly caused the declaratory judgment action. So, I do think you have a direct correspondence. You've got offer of business or a business relationship, you have a meeting proposing this, you have a refusal to do business, which results in allegations of infringement, which results in a declaratory judgment action. So I think there is a clear chain that runs from that first letter to the declaratory judgment action. How does this case differ from the Avocent case? In Avocent, all the other activity was directed at third parties. The only thing in Avocent that was directed at the declaratory judgment plaintiff was the cease and desist letters. So, I'm trying to see how much weight you're placing on the visit to Tennessee. If that visit had not occurred, but in fact that had been conducted by letter or telephone, the same presentation that was made, do you think that would make a dispositive difference in this case? I don't think so, because in this day and age, you can accomplish the same thing through emails as you can sitting down and having a face-to-face. But that just seems to back into Redmond's shoot, because we know with the starting point here is that, call it threats or call it invitations to license or call it invitations to engage in a productive, cooperative business venture, it's all the same thing, really. You have a patent. You have someone who either you wish to license the patent or produce the patented goods with one arrangement or another, and you send them a letter. That isn't enough under Red Wing's shoe, as I understand the line of cases to trigger declaratory judgment jurisdiction in the recipient's home form. That's correct. But I think in Red Wing's shoe, this court brings out the point that we're talking about the fairness prong of the jurisdictional analysis, and there we're looking at saying that we're not going to prohibit the patentee from sending a cease and desist letter. We're not going to say that offering a license along with those infringement allegations is going to subject him to jurisdiction, because it's not fair. But when you take a case like this and electronics for imaging, and you say, here is a whole course of dealings that precedes the infringement allegations, you've got a different fairness analysis. You've got a situation where Radio Systems is sitting there, minding its own business, and suddenly it has this unsolicited business offer. What follows is a series of communications, and Mr. Sullivan, Accessions President, was very thorough. He contacted and contacted and contacted. There comes a point where you say enough is enough, that we're going to allow the patentee to inform of patent rights. But when he tries to strike bargains with people prior to the allegation to infringement, we've got to consider the fairness of that. When it's striking bargains, there's contacting. I mean, presumably, these contacting letters, certainly if there's more than one of them, typically will make some kind of an overture as to the shape of a potential bargain. Again, you wouldn't think that would be enough to get you outside of the scope of Red Wing Shoe, would you? Well, if you look at Red Wing Shoe as saying that we are going to, the reason for it is to prevent the patentee to put people on notice of their patent rights, I think you have to make a decision at what point do you go beyond just informing somebody of the patent rights. You know, I think electronics for imaging is a good example of that. You've got a situation where it's essentially the same facts. Well, in that case, though, there were good discussions related to the validity of the patent. Well, the discussions in the declaratory judgment action are also going to entail questions similar to that. Well, that's precisely the point, that the discussions that were held related to the validity of the patent and therefore can be argued to be other actions that provide a basis for jurisdiction in a declaratory judgment action. And that's what Avocent called for, that the defendant must have engaged in other activities that relate to the enforcement or the defense of the validity of the patent. So in what respect did the meetings relate to the enforcement or the defense of the validity of the patent? Well, I think the meetings relate because he says, I have patent rights here or I am about to have patent rights and, you know, these are going to be enforceable rights at some time. He's referring us to the patent, asking us to read the patent, and he's saying, this is my little niche that I'm going to have and I'm really willing to give you a bite of the apple or all of the apple or whatever. So it is related. We don't really know what happened in the meeting. I mean, there's one letter or email, I forget which it is, that describes this version of what happened, but it's not very detailed. So we're sitting here and you're saying that, you know, this happened, but I don't know that that's supported by the record, nor is the opposite supported by the record. What is the letters themselves, the emails themselves, show what was being discussed? We have no record of the meeting. Well, they don't really disclose, unless I'm mistaken, they don't disclose what was discussed about the patent, do they? They disclose that a patent, that he is serving these patent rights, or soon to be patent rights, and he's saying, I want you to look at my patent. I thought he'd have the patent by the time of the meeting. I think by the time of the meeting he may have, but I'm talking about the earlier time frame where you do have a situation where he is telling us, leading up to the meeting, what he wants. He wants a deal on his patent, and I don't think we can presume that anything different was discussed in the face-to-face meeting. Why don't we reserve the rest of your time for this, I believe, and Mr. Basil, is that correct? I got it right or wrong? Wrong. Wrong, sorry, Basil. Basil. There we go. But since, you know, my father invented the name, I guess it's up for interpretation. Before you get into the material which we were just discussing, that is the constitutional limits, take a moment, would you, to address the alternative argument, and that is that this venue clause in the agreement is applicable here. There is a New Jersey action which your client has brought here. It's a little unclear, I pulled up the complaint, it's a little unclear as to what's going on here, but isn't it possible that in the infringement action that there may be an issue about some of the disclosures that were made in connection with this meeting and pursuant to this agreement? I mean, are they entirely separate? Yes, Your Honor, we have made no claim in the New Jersey case or in the counterclaim, the counterclaim in Tennessee, that anything happened at that meeting that there's no trade secret violation or anything to do with that. So that issue is not the subject of litigation. I don't believe it will be. So there is no issue that's been brought to either court which relates to the nondisclosure agreement. Well, okay, accepting that, but when they were drafting the nondisclosure agreement, isn't it possible that there was a relationship between the subject matter of the nondisclosure agreement and the possible infringement action? I don't think so, Your Honor, because the nondisclosure agreement, by necessity, only addresses things which are not public. And it carves out exceptions for things that are known by the parties that have been published. So the nondisclosure agreement, by definition and by its own terms, addresses not patent issues, which are open to the public, but issues which are going to be disclosed at the meeting for the first time. So I don't get the connection at all between my client going down there to Tennessee and signing this NDA and subjecting himself to any particular jurisdiction over a patent issue, because the NDA, by definition, can't apply to patent issues. Patent issues are public. So I really had a hard time. But patent issues were discussed at the meeting. I have no idea, Your Honor. Other than the fact, I assume, that we had one at the time. I have no idea. Do we need to know what happened at the meeting? We do not. Why not? Because, you know, Judge Lin's opinion in Avocet has been interpreted. But it's the court's opinion. Well, let me give you some credit, because I like your opinion. But anyhow, the court's opinion in Avocet states that only events that relate to defense or the patent or enforcement of the patent count. That's what Avocet says. That's what autogenetics, genomics says almost immediately afterward. So you have a record before you. The record is not disclosed. I suppose at the meeting they'd say, you better license this patent, or we'll see you for infringement. You better license this patent, or we will see you for infringement. Does that make sense? Yeah. I think that would do it, Your Honor. I think that would do it. If you went down, my client goes down to Tennessee and says, look, you're an infringer, so you better license this patent, or we're going to sue you. Yeah, that would be an act in the state of Tennessee that certainly advanced the defense or war. But if he sent a letter by fax, I guess no one uses fax anymore. One way or another, he sent a letter to Tennessee, not enough. No. But he gets on an airplane and goes down and has a meeting, and the meeting is very short. He says, here's my draft complaint. Either license or I sue. Right. It's the part where he says, either license or I sue. If he just goes down there and says that. The letter says the same thing. If that wouldn't be enough, I take it you're saying. I think not, only because of the way that the jurisprudence has come down. I mean, it's hard to distinguish the effect of those two approaches to the same goal. Well, I mean, the cases in support of possible distinction, the cases do emphasize that physical presence in the jurisdiction makes a difference. Is there quite a difference between the court decision in Quill and so on and so forth? Sure. But I think that if the original scenario by Judge Bryson is if you go down there and say license is patent or I'm going to sue you, I believe at that point that would be enough. Just sending the fax in doesn't move me the same way. But it cannot be the case, I take it, that if he goes down and he says, I have a patent and I'd really very much enjoy a cooperative business relationship with you through a license that, I mean, that may not be enough to trigger the subject matter jurisdiction under the Declaratory Judgment Act, but it surely is enough that you wouldn't draw a line between that and the case in which he pounds the table and says I'll sue you, right? They'd both be enough. Either they're both sufficient to give in persona jurisdiction or not, right? Going down there just to market the product is not... No, going down there to market the patent, in effect, by saying I want to engage in a cooperative business venture which is predicated on the fact that I have a patent and you need a license, or at least put in very polite terms, as I'm sure... If the implication is that you're an infringer already, then yes. Well... If the implication is, hey, I've got this patent and it would be a good idea if you license it, no, it's just marketing. So, again, I mean, this all started from the question about the NDA and the scope and drifted into the federal personal jurisdiction, but it's very important because I think under Avaset and the case that came afterwards, that it's very clear that only if it's in the record that there were efforts within the state to defend the patent, that it's out, and that's not the case here. There's nothing like that in the record. So, really, I think that a radio system has to rely on that NDA, and the NDA, as I said in the brief, the purpose section says nothing about patents. The purpose section is about getting together for a business venture and protecting, actually, radio systems' trade secrets because it's their form. They're the ones that insisted on having it, and while it also protects any trade secrets, my client has, I'm not sure if he had any, the whole purpose of that was because radio systems gets a lot of these things and they don't want someone coming in and suing them the next day saying, oh, you know, I disclosed my trade secrets, now you're using them. Remind me where in the record the account of the meeting is found. Well, I'm not sure. This is a bit sketchy, but I want to just see what is in the record with respect to what was heard. As far as I know, it's just in the record that we had the meeting, and there's no real description of what was said here, other than it's obvious that there's... There's no affidavits here. I think it may be the document that starts at 290. Okay, page 294. Yeah, there's a description of that. Are you looking at 294, page 294? I'm looking at 294. Yeah, there's right in the middle, at 4109, is that... That's it? Yeah. All right. There's certainly nothing in that sports record about enforcing the patent or the patent at all. Okay. So again, I believe my client would be very surprised to learn that he had consented to the jurisdiction of Tennessee in the event that Radio Systems was filing a declaratory judgment action on infringement. There's nothing in that NDA to indicate that that's so. In addition, let's go back to what this scenario is really about, and that is you have a very large network of designers, and you have my client who is a one-person shop who has no sales, no income, who operates out of a garage in New Jersey, and he's trying to sell his product, trying to get a license or an outlet for it. And his patent attorney writes in 2009 and says, hey, to Radio Systems, you're infringing on a patent. It really has nothing to do with 2007. The patent infringement allegation would arise whether or not my client had gone down to Tennessee, whether or not my client had ever had any contact with Radio Systems, had his attorney discovered the patent or the product and looked at it and said it's infringing, the scenario would have gone forward just the same, 2009 forward, 2009 forward. But what happens is Radio Systems, knowing that my guy, my client has no revenue, no means of really defending, rushes to the courthouse in Tennessee. They race to the courthouse. It's not much of a race because my client isn't racing, but they race to the courthouse and try and haul him out of his garage in New Jersey where he's doing this work down in Tennessee to litigate the patent issue. And so when you get to the issue of fairness, which is also in the state law, you know, the whole state law about choice of form and how you interpret contracts and how you enforce contracts as a court also depends on fairness. And this would be unfair. My client does one thing. He goes down there and tries to sell his product. He's not successful. A year and a half later, unrelated to that effort, he finds out that there's a possible infringement. So what happens, rather than have a fair chance where he can litigate relatively inexpensively for the attorney's fees, he gets hauled into court in Tennessee. And that goes to the fairness of both the contract issue and the federal jurisdiction issue. And I think that it's not addressed by the district court because there was no need to, but I think that in the event that this court finds questions that the fairness should come into play and that the fairness issue should be found on the side of my client and not down in Tennessee. Very well. Thank you. Thank you, Mr. Baseman. And we'll hear about it from Mr. Britton. Your Honor, as to the confidential disclosure agreement, I guess as our briefs indicate, we disagree as the scope of the NDA. It's clear that when a manufacturer asks for a confidential disclosure agreement, what the manufacturer is trying to do is trying to define what is patent matter that was disclosed in the publication of the patent and make sure that they aren't sued for disclosing that information. It's also to set the boundaries on what everybody's obligations are with respect. This confidential disclosure agreement relates to the 141 patent, and it was put in place to allow the parties to talk about the 141 patent. The clause itself, which applies, it says causes of action arising or a cause of action arising out of subject matter relating to the agreement. I don't know how you can look at the circumstance and have the patent not relate to the subject matter of the agreement. And as to the rush to the courthouse, if you look at the correspondence that happens after the allegations of infringement, there was no rush after that. The parties simply ran into a situation where they couldn't agree. They were trying to intervene in our patent prosecution on our patents, and Radio Systems was forced to take some action to get it stopped. So there was no rush. It was a matter of necessity to get the process going and stop their intervention into our past patent processes. Thank you. Thank you. The case is submitted.